**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **B.K., an individual,** | |
| **Plaintiff,** | **Case No.** _____ |
| | **JUDGE** _____ |
| **v.** | |
| **LEE ELLE MANAGEMENT LLC, d/b/a STAR CITY INN & SUITES;** | **DEMAND FOR JURY TRIAL** |
| **SAI-OHEM HOSPITALITY LLC, d/b/a FORTY MOTEL;** | |
| **SHADY LANE ADULT MOTEL;** | |
| **P & S SHIVAM LLC, d/b/a BUDGET INN** | |
| **SUNSTAR COLUMBUS INC., d/b/a RED CARPET INN** | |
| **VIMCO CORPORATION, d/b/a CAPITAL MOTEL** | |
| **NANDNI CORPORATION, d/b/a BROOKSIDE MOTEL** | |
| **OM KALI NIRMAN LLC, d/b/a HOMETOWN MOTEL** | |
| **Defendants.** | |

**<u>COMPLAINT</u>**

COMES NOW, the Plaintiff B.K. ("Plaintiff" or "B.K."), by and through her undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## **INTRODUCTION**

1.     For decades, sex trafficking operations have taken place openly in hotels and motels across the United States.

2.     For decades, the hotel industry has publicly acknowledged the issue of human trafficking on both brand and independently owned properties. Yet, where such crimes are most widespread, these properties ultimately profited and continue to profit from activities occurring at these locations. Human trafficking remains a persistent problem within the hotel and hospitality industry.

3.     While major hotel brands issue misleading public statements to protect their reputations, many independently owned and operated hotels and motels deny any knowledge of human trafficking on their premises. Some are actively involved facilitating trafficking, protecting traffickers, and turning a blind eye as countless victims are beaten, abused and raped everyday on their property.

4.     The Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S. Code § 1595, gives survivors like B.K., an ability to hold those responsible for her trafficking accountable and for civil recourse against those whom "knowingly benefit, or attempt, or conspire to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in [recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting a person that will be caused to engage in commercial sex by use of force, fraud or coercion; or forcing a person to engage in commercial sex by use of force, fraud or coercion]...."

5.     Plaintiff is a survivor of human sex trafficking.

6.     B.K.'s life story reads like a tragedy wherein she was forced to endure violence,

trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation.

7.      B.K. was put into sex trafficking by a man she was dating. Ultimately, her trafficker came to control every aspect of her life. The defining factor of the relationship between B.K. and her trafficker, was that each night, B.K.'s trafficker forced her to have sex with men for money.

8.      B.K. was trafficked in hotels owned by Defendants Lee Elle Management LLC, d/b/a Star City Inn & Suites, Sai-Ohem Hospitality LLC, d/b/a Forty Motel, Shady Lane Adult Motel, P & S Shivam LLC, d/b/a Budget Inn, Sunstar Columbus Inc., d/b/a Red Carpet Inn, Vimco Corporation, d/b/a Capital Motel, Nandni Corporation, d/b/a Brookside Motel, and Om Kali Nirman LLC, d/b/a Hometown Motel .[1] B.K.'s trafficker rented hotel rooms for one purpose—a location to engage in sex trafficking.

9.      At Defendants' hotels and motels, B.K. was forced to engage in sex with many men every day. Every new customer was another instance B.K. was forced to have sex against her will—that is to say, B.K. was raped multiple times per day by multiple men when she stayed at Defendants' hotels and motels.

10.     B.K.'s trafficker forced her onto Defendants' properties where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of physical and psychological abuse.

11.     At some point, B.K. was able to escape the grasps of her traffickers and the prison of the Defendants' hotel and motel rooms.

12.     B.K. has spent a considerable amount of time attempting to regain the life that was stripped away from her as a result of her trafficking.

---

[1] Properties Lee Elle Management LLC d/b/a Star City Inn & Suites, Sai-Ohem Hospitality LLC d/b/a Forty Motel, Shady Lane Adult Motel, P & S Shivam LLC d/b/a Budget Inn, Sunstar Columbus Inc. d/b/a Red Carpet Inn, Vimco Corporation d/b/a Capital Motel, Nandni Corporation d/b/a Brookside Motel, and Om Kali Nirman LLC d/b/a Hometown Motel, will hereinafter be referred to collectively as "Defendants."

13. B.K. files this lawsuit seeking civil recourse and justice for the harm she suffered as a result of the heinous acts committed against her while she was being sold for sex at the hotels owned, operated, managed, supervised, and/or controlled by Defendants and their agents and employees, whom all knew or should have known what was occurring on the properties.

## PARTIES

14. Plaintiff B.K. is a natural person and a resident and citizen of Columbus, Ohio.

15. B.K. is a victim of human trafficking pursuant to 22 U.S.C. § 7102(17) and (18) U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 11 U.S.C. § 7102(16).

    a. Due to the sensitive and intimate nature of the issues, B.K. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after. [2]

    b. Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[3] However, there are exceptions when the issues involved are of a sensitive and personal nature. [4] For good cause, the Court

---

[2] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[3] Fed. R. Civ. P. 10(a).

[4] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

may issue an order to protect a part or person from annoyance, embarrassment, oppression or undue burden or expense.[5]

c. Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. B.K. fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

d. B.K. should not be compelled to disclose her identity in order to maintain her privacy and safety. B.K.'s privacy interest substantially outweighs the customary practice of judicial openness.[6]

e. Moreover, Defendants will not be prejudiced. B.K. will agree to reveal her identity to Defendants for the limited purpose of investigating B.K.'s claims once the parties have entered into a protective order. B.K. simply seeks redaction of B.K.'s personal identifying information from the public docket and assurances that Defendants will not use or publish B.K.'s identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

16. **Defendant Lee Elle Management LLC ("Lee Elle") d/b/a Star City Inn & Suites** is a limited liability company organized under the laws of and operating within the State of Ohio. It can be served by its registered agent, Yacov Sudai, located at 5339 Highpointe Lakes Drive, Apt 101, Westerville, OH 43081.

17. Defendant owned, operated and supervised the Star City located at 3131 Broadway,

---

[5] Fed. R. Civ. P. 26(c).

[6] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

Grove City, OH 43123, about or during December 2012 through June 2017.

18.    Defendant benefited from its operations at the Star City Inn & Suites in more ways than just through room revenue. Upon information and belief, Defendant gathered personal data from the Wi-Fi services it provided to guests, including both B.K. and her trafficker. This data collection provided further value to Defendant enhancing its ability to market and promote its services while maintaining and promoting a positive public image for its property.

19.    Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation is that Defendant engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Star City Inn & Suites, where B.K. was trafficked.

20.    **Defendant Sai-Ohem Hospitality LLC ("Sai-Ohem") d/b/a Forty Motel** is a limited liability company organized under the laws of and operating within the State of Ohio. It can be served by its registered agent, William Klausman, Esq. located at 75 E. Gay Street, Suite 300, Columbus, OH 43215.

21.    Defendant owned, operated and supervised the Forty Motel located at 3705 W Broad St, Columbus, OH 43228 from during or about July 2003 through June present.

22.    Defendant benefited from its operations at the Forty Motel in more ways than just through room revenue. Upon information and belief, Defendant. gathered personal data from the Wi-Fi services it provided to guests, including both B.K. and her trafficker. This data collection provided further value to Defendant, enhancing its ability to market and promote its services while maintaining and promoting a positive public image for its property.

23.    Whenever reference is made in this Complaint to any act, deed, or conduct of Sai-

Ohem, the allegation is that Defendant engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Forty Motel, where B.K. was trafficked.

24. **Defendant Shady Lane Adult Motel ("Shady Lane")** is a company organized under the laws of and operating within the State of Ohio. It can be served by its owner, Alane Davis, located at 1941 Rockdale Drive, Columbus, OH 43229.

25. Defendant Alane Davis privately owned, operated and supervised the Shady Lane Adult Motel located at 3963 Westerville Road, Columbus, OH 43224 from 2007 through August 2013.

26. Defendant Shady Lane benefited from its operations at the Shady Lane Adult Motel through room revenue.

27. Whenever reference is made in this Complaint to any act, deed, or conduct of Shady Lane, the allegation is that Shady Lane engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Shady Lane Adult Motel, where B.K. was trafficked.

28. **Defendant P & S Shivam LLC ("P & S")** is a limited liability company organized under the laws of and operating within the State of Ohio. It can be served by its registered agent, Jignesh Patel, located at 3963 Westerville Pike, Columbus, OH 43224.

29. Defendant P & S owned, operated and supervised the Budget Inn located at 3963 Westerville Road, Columbus, OH 43224 from on or about August 2013 to present.

30. P & S benefited from its operations at the Budget Inn in more ways than just through

room revenue. Upon information and belief, P & S gathered personal data from the Wi-Fi services it provided to guests, including both B.K. and her trafficker. This data collection provided further value to P & S, enhancing its ability to market and promote its services while maintaining and promoting a positive public image for its property.

31.     Whenever reference is made in this Complaint to any act, deed, or conduct of P & S, the allegation is that P & S engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Budget Inn, where B.K. was trafficked.

32.     **Defendant Sunstar Columbus Inc., ("Sunstar") d/b/a Red Carpet Inn** is an incorporation organized under the laws of and operating within the State of Ohio. It can be served by its registered agent, Harihar Patel, located at 187 Oak Mill Street, Addison, IL 60101.

33.     Defendant owned, operated and supervised the Red Carpet Inn located at 1289 E. Dublin Granville Road, Columbus, OH 43229 from during or about August 2013 through November 2015.

34.     Defendant benefited from its operations at the Red Carpet Inn in more ways than just through room revenue. Upon information and belief, Sunstar gathered personal data from the Wi-Fi services it provided to guests, including both B.K. and her trafficker. This data collection provided further value to Sunstar, enhancing its ability to market and promote its services while maintaining and promoting a positive public image for its property.

35.     Whenever reference is made in this Complaint to any act, deed, or conduct of Sunstar, the allegation is that Sunstar engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged

in the management, direction, control, or transaction of the ordinary business and affairs of Red Carpet Inn, where B.K. was trafficked.

36. **Defendant Vimco Corporation, ("Vimco") d/b/a Capital Motel** is a corporation organized under the laws of and operating within the State of Ohio. It can be served by its registered agent, William Klausman, Esq. located at 75 E. Gay Street, Suite 300, Columbus, OH 43215.

37. Defendant owned, operated and supervised the Capital Motel located at 3045 E. Main Street, Columbus, OH 43209 from during or about January 1987 through October 2024.

38. Defendant benefited from its operations at the Capital Motel in more ways than just through room revenue. Upon information and belief, Vimco gathered personal data from the Wi-Fi services it provided to guests, including both B.K. and her trafficker. This data collection provided further value to Vimco, enhancing its ability to market and promote its services while maintaining and promoting a positive public image for its property.

39. Whenever reference is made in this Complaint to any act, deed, or conduct of Vimco, the allegation is that Vimco engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Capital Motel, where B.K. was trafficked.

40. **Defendant Nandni Corporation, ("Nandni") d/b/a Brookside Motel** is a corporation organized under the laws of and operating within the State of Ohio. It can be served by its registered agent, Hetal Patel, located at 3020 E. Main Street, Columbus, OH 43209.

41. Defendant owned, operated and supervised the Brookside Motel located at 3020 E. Main Street, Columbus, OH 43209 from during or about June 2007 through present.

42.     Defendant benefited from its operations at the Brookside Motel in more ways than just through room revenue. Upon information and belief, Nandni gathered personal data from the Wi-Fi services it provided to guests, including both B.K. and her trafficker. This data collection provided further value to Nandni, enhancing its ability to market and promote its services while maintaining and promoting a positive public image for its property.

43.     Whenever reference is made in this Complaint to any act, deed, or conduct of Nandni, the allegation is that Nandni engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Brookside Motel, where B.K. was trafficked.

44.     **Defendant Om Kali Nirman LLC, ("OKN") d/b/a Hometown Motel** is a limited liability company organized under the laws of and operating within the State of Ohio. It can be served by its owner/registered agent, Manubhai N. Patel, located at 272 Chestnut Drive, Brunswick, Georgia 31523.

45.     Defendant owned, operated and supervised the Hometown Motel located at 1300 Harrisburg Pike, Columbus, OH 43223 from during or about January 2014 through April 2019.

46.     Defendant benefited from its operations at the Hometown Motel in more ways than just through room revenue. Upon information and belief, OKN gathered personal data from the Wi-Fi services it provided to guests, including both B.K. and her trafficker. This data collection provided further value to OKN, enhancing its ability to market and promote its services while maintaining and promoting a positive public image for its property.

47.     Whenever reference is made in this Complaint to any act, deed, or conduct of OKN, the allegation is that OKN engaged in the act, deed, or conduct by or through one or more of their

officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Hometown Motel, where B.K. was trafficked.

## JURISDICTION AND VENUE

48.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

49.     The Court has personal jurisdiction pursuant to the TVPRA.

50.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants have their principal places of business within this District.

51.     Venue is proper in this District pursuant to Southern District of Ohio Local Rule 3.1(b), this case is related to the sex trafficking cases currently pending before Judge Algenon L. Marbley.

## OVERVIEW OF TRAFFICKING

52.     For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded throughout hotels, while hospitality giants stood on the sidelines and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from their trafficking occurring on their properties.

53.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in so-called prostitution are subject to force, fraud, or coercion.[7] It is

---

[7] See, e.g., A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; Prostitution and Trafficking in Women: An Intimate Relationship, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women intimate-relationship.

also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

54.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[8]

55.     Defendants knew and have known for decades that they profit from sex trafficking repeatedly occurring under their individually owned properties. Rather than taking timely and effective measures to stop profiting from this epidemic, Defendants chose to ignore the open and obvious presence of sex trafficking on their individually owned properties, benefitting from the profit and fees created by rooms rented and Wi-Fi provided for this explicit and apparent purpose.

56.     The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[9] However, traffickers aren't the only profiteers. The hotel industry, including Defendants, profit from participating in ventures that they know or should have known engage in violations of 18 U.S.C. § 1591(a) through renting rooms where sex trafficking victims are harbored night after night and providing Wi-Fi that traffickers use to advertise and solicit victims for commercial sex acts. Defendants and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

57.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Defendants knew or should have known regarding the trafficking

---

[8] *Id.*
[9] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

of B.K. at Defendants' Hotels and Motels.

58.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[10] This is no accident. For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[11] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[12] Hotels have been found to account for over 90 percent of commercial exploitation of children.[13]

59.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including the defendants, on best practices for identifying and responding to sex trafficking.[14]

60.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and End Child Prostitution, Child Pornography, and the Trafficking of Children for Sexual Purposes ("ECPAT"), among others, have established recommended policies and procedures for recognizing the signs of

---

[10] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-traffickingusslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere."
[11] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.
[12] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hospitality Industry, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wpcontent/uploads/2019/05/Adoptingthecode.report.cornell.pdf
[13] Erika R. George & Scarlet R. Smith, In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).
[14] See, e.g., Department of Homeland Security, Blue Campaign Toolkit, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, Child Sex Trafficking Overview, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, Red Flags for Hotel and Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

sex trafficking.[15]

61.     Widely recognized signs of sex trafficking, which can be observed by hotel staff all which Defendants' properties were made of aware of, include but are not limited to:

    a.  Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

    b.  Individuals show signs of physical abuse, restraint, and/or confinement;

    c.  Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

    d.  Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

    e.  Individuals lack freedom of movement or are constantly monitored;

    f.  Individuals avoid eye contact and interaction with others;

    g.  Individuals have no control or possession of money or ID;

    h.  Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

    i.  Individuals have few or no personal items – such as no luggage or other bags;

    j.  Individuals appear to be with significantly older "boyfriend" or in the company of older males;

    k.  A group of girls appear to be traveling with an older female or male;

    l.  A group of males or females with identical tattoos in similar locations. This may

---

[15] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, Red Flags for Hotel & Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, Human Trafficking Red Flags, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

indicate "branding" by a trafficker;

m.  Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n.  Possession of bulk sexual paraphernalia such as condoms or lubricant;

o.  Possession or use of multiple cell phones; and

p.  Possession or usage of large amounts of cash or pre-paid cards.[16]

62.     The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[17] From check-in to check-out, there are indicators that traffickers and their victims exhibit during their stay at the hotel.

63.     The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Defendants and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite: continuing with business as usual, so that Defendants and all industry participants continue to profit thousands from participating in a venture in violation of § 1591(a).

64.     Defendants' decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of Plaintiff B.K. on their properties.

65.     B.K. is a survivor of sex trafficking. Key findings from the Polaris Project are that "[s]urvivors of human trafficking are not thriving. The systems that were supposed to protect them

---

[16] *Id.*
[17] Department of Homeland Security, Blue Campaign Toolkit, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

before, during and after their human trafficking situations failed and failed miserably. Systems such as child welfare, criminal justice and legal systems failed."
https://polarisproject.org/national-survivor-study/

66.     B.K. looks to the judicial system, who has been empowered by Congress to provide a remedy to Victim-Survivors pursuant to the TVPRA, 18 U.S.C. § 1595. Defendants knowingly benefitted from participation in a venture that it knew or should have known to be engaging in violations of 18 U.S.C. § 1595(a).

## FACTUAL BACKRGOUND

## INTRODUCTION

67.     B.K. brings her claims against multiple hotel locations for violations of the TVPRA.

68.     The TVPRA prohibits Defendants from profiting from any venture they know or should know involves a violation of § 1595(a) and thereby establishes a non-delegable duty of reasonable care.

69.     An overwhelming majority of commercial sex trafficking transactions occur within the hotels and motels, as traffickers use their rooms as the hub for their operations.[18] Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues sex trafficking. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. In addition, traffickers regularly use Defendants' Wi-Fi to advertise and solicit victims for commercial sex against their will.

70.     Upon Information and belief, as part of their conspiracy, to save costs and continually reap profits, Defendants generally failed to create, adopt, implement, and enforce

---

[18] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754.

company-wide policies and procedures regarding suspected incidents of human trafficking at the wholly and independently owned properties—despite the general knowledge in the industry and their own records that human sex trafficking was happening in the hotel industry and in their wholly and independently owned properties. Furthermore, Defendants did not train staff on how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

71. Upon information and belief, Defendants kept no reports or data on suspected incidences or occurrences of human trafficking on their properties and the rate at which those occurrences decreased as a result of implementing human trafficking policies and procedures. Defendants did not establish mandatory and secure reporting mechanisms at the point of sale.

72. Upon information and belief, Defendants did nothing in the face of the human sex trafficking epidemic in their industry.  Instead, they continued to profit from the rental of rooms that they knew or should have known were rented and used for the purpose of sex trafficking.

73. Upon information and belief, Defendants thus failed to act to ensure that it did not benefit from the human sex trafficking occurring at its wholly and independently owned properties. Defendants failed to implement appropriate policies and procedures that a reasonably diligent business would or should have implemented so that it would not continue to benefit from the human trafficking occurring at their wholly and independently owned properties.

74. With little to no risk posed to traffickers seeking to use Defendants' rooms as a location to force victims like B.K. to engage in commercial sex against her will, the sex trade continues to thrive at Defendants' wholly and independently owned properties while Defendants reap the benefits.

75. Plaintiff B.K.'s injuries are indivisible and cannot be separated. B.K.'s injuries are the result of continued instances of ongoing violent, traumatizing sexual exploitation.

76. B.K.'s injuries are almost exclusively mental, emotional, and psychological in nature and derive from the trafficking period. The trafficking period is ongoing and continuous and resulting injuries cannot be divided; thereby subjecting Defendants to joint and several liability. Federal common law provides for joint and several liability for indivisible injuries, such as those suffered by B.K.

77. Plaintiff's injuries, particularly B.K.'s ongoing mental, emotional, and psychological injuries, have no reasonable basis on which to determine the relative contribution of a particular defendant's conduct to the single harm.

78. Violators of Section 1595 of the TVPRA are jointly and severally liable for a victim's damages. Victims are entitled to all compensatory and non-compensatory damages incurred during their trafficking period. 18 U.S.C. § 1595(a). Thus, Defendants are jointly and severally liable for B.K.'s damages in this case.

**THE SEX TRAFFICKING OF PLAINTIFF B.K.**

79. B.K. was placed into sex trafficking when she was 24-years-old.

80. By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, control over identification documents and possessions, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, B.K. was held captive and sold for sex by her traffickers.

81. During the time that she was trafficked, B.K.'s trafficker frequently rented rooms at the Defendants' hotel and motel locations because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with B.K.

82. Throughout her trafficking, B.K.'s trafficker connected with "johns" by posting or causing to be posted advertisements, on websites commonly used for the soliciting of sex, advertising for B.K.'s availability for such acts. B.K.'s trafficker posted many of these advertisements and had conversations with "johns" while connected to Defendants' Wi-Fi.

83. B.K. was forced to have sex with multiple "johns" every day she was trafficked in Defendants' hotels and motels.

84. From approximately 2002 through 2018, while under the coercive control of her trafficker, B.K. was imprisoned in hotels rooms rented by her trafficker and forced to have sex for money.

85. While at Defendants' wholly and independently owned properties, B.K.'s trafficker violently attacked and beat her, and psychologically tormented her by withholding food and water, all to ensure that she could not escape. Her deterioration and poor health conditions were obvious to anyone who saw her.

86. During her captivity at Defendants' wholly and independently owned properties, B.K. was raped, continuously abused physically and verbally, malnourished, psychologically tormented, kidnapped, and imprisoned.

87. At the above-listed hotels, B.K. encountered the same staff on multiple occasions. Defendants staff would have seen the signs of B.K.'s deterioration brought on by the abuse perpetrated by her traffickers, including bruising and physical and verbal abuse occurring in public areas of Defendants' properties as well as signs of malnutrition and poor health.

88. Every time B.K. interacted with the Defendants' staff, it was readily apparent that B.K. was under the control of her trafficker. B.K.'s trafficker checked in to Defendants' hotels using B.K.'s name, or his name. B.K.'s trafficker was a drug dealer, and would often give people

drugs in exchange for them renting a room at Defendants' properties. B.K.'s trafficker would also choose several properties that did not require identification to rent a room.

89.    B.K.'s trafficker followed a repetitive and routine procedure during stays at the Defendants' wholly and independently owned properties, and Defendants knew or should have known of B.K.'s trafficking because of a variety of factors detailed below.

90.    Plaintiff was trafficked for sex at the Star City Inn & Suites located at 3131 Broadway, Grove City, OH 43123, regularly about or between May 2016 through April 2017.

91.    Plaintiff was trafficked for sex at the Forty Motel located at 3705 W. Broad Street, Columbus, OH 43228, regularly during 2013 through 2018.

92.    Plaintiff was trafficked for sex at the Shady Lane Adult Motel located at 3963 Westerville Road, Columbus, OH 43224, regularly during 2012 through August 2013.

93.    Plaintiff was trafficked for sex at the Budget Inn located at 3963 Westerville Road, Columbus, OH 43224, regularly during August 2013 through 2018.

94.    Plaintiff was trafficked for sex at the Red Carpet Inn located at 1289 E. Dublin Granville Road, Columbus, OH 43229, regularly during Fall 2014.

95.    Plaintiff was trafficked for sex at the Capital Motel located at 3045 E. Main Street, Columbus, OH 43209, regularly during 2016 through 2017.

96.    Plaintiff was trafficked for sex at the Brookside Motel located at 3020 E. Main Street, Columbus, OH 43209, regularly during 2016 through 2017.

97.    Plaintiff was trafficked for sex at the Hometown Motel located at 1300 Harrisburg Pike, Columbus, OH 43223, regularly during 2014 through 2017.

98.    For approximately 16 years, B.K.'s trafficker rotated between hotels and chose the Defendants' locations as their most frequented due to their relationships between trafficker and the

hotel employees that allowed the trafficker free reign to conduct their illegal trafficking business.

99.     Due to the relationships between Defendants' employees and B.K.'s trafficker, B.K. understood that the Defendants' hotels and motels staff, employees, and owners would not help her and that she would likely be beaten or killed if she sought help from them.

100.    During this time, B.K. was under the control of her trafficker and endured many beatings, threats and psychological manipulation. B.K. would frequently have visible bruises and injuries.

101.    Staff at the Defendants' hotels and motels saw and heard the fights occurring on their properties, including but not limited to involving B.K. and her trafficker, but did not call the police or intervene in anyway to help.

102.    Plaintiff's traffickers often had multiple girls at the hotels. There was constant, ongoing foot traffic going in and out of the rooms rented by B.K.'s trafficker.

103.    During the time B.K.'s trafficker held her captive at the Defendants' hotels and motels, Plaintiff's traffickers or Plaintiff herself would ask for excessive amounts of linens and towels throughout their stays as a direct result of the trafficking.

104.    B.K. consistently witnessed clear signs of others being sex trafficked at the same times she was trafficked at the Defendants' hotels and motels, meaning it should have been easily detectible upon reasonable inspection.

105.    It became clear to B.K. during the time of her trafficking that her trafficker and the Defendants' sex trafficking operation was a routine business operation and the hotels and motels were welcoming and participating in.

**THE SEX TRAFFICKING OF B.K. AT STAR CITY INN & SUITES**

106.    Plaintiff B.K. was subjected to sex trafficking at the privately owned Star City

Inn & Suites ("Star City") located at 3131 Broadway, Grove City, OH 43123.

107. B.K. and her trafficker stayed at the Star City between May 2016 through April 2017, frequently staying for days at a time, encountering the same staff, within this period.

108. Hotel staff at Star City always placed B.K. and her trafficker in a room away from other guests. There were only male guests in and out of B.K. and her trafficker's room while multiple girls were kept in a room at once.

109. On more than one occasion, B.K.'s trafficker physically abused her at the Star City Inn & Suites.

110. B.K.'s pain and suffering at the Star City was ongoing, as loud sounds of abuse and B.K.'s screams for help could often be heard from the room.

111. Further, B.K.'s stays at the Star City resulted in several consistent red flags, including, but not limited to: paying for stays in cash; obvious signs of illegal drug use; frequent requests for linen changes; unusually large number of used condoms in the trash; physical abuse in public spaces; visible signs of prior and private physical abuse; unusually large number of male visitors coming in and out of the room; women wearing clothing inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms; and loitering or soliciting on hotel grounds.

112. B.K. was repeatedly raped and otherwise sexually abused many times at the Star City.

113. Based on information and belief, before and at the time B.K. was trafficked at the Star City, staff saw B.K. being held captive, controlled, drugged, abused, hit, and trafficked for sex there. Defendant and their employees directly witnessed all signs of sex trafficking, including the trafficking of B.K., described above.

114. Defendant knew or should have known staff at its property was participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their property, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; allowing daily payments of cash for prolonged stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms; allowing many "johns" to come in and out of the rooms where victims were trafficked in; allowing guests to use illicit drugs on property; allowing guests to carry weapons on the property; ignoring large amounts of sex paraphernalia; not addressing trafficking signs and reports of drugs, abuse, and prostitution; forming relationships with traffickers and treating traffickers with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking to authorities or taking any steps to prevent it at their properties.

115. Defendant has direct access to reviews left by guests on websites wherein guests frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and other signs of trafficking.

116. Upon information and belief, Defendant read all online reviews about their property. Numerous reviews were left online about Star City Inn & Suites that directly put Defendant on notice of red flags of sex trafficking, including during May 2016 through April 2017. Reviews specifically mention prostitution on the property, hookers, drug dealers and drug users, police presence and swat raids, employees doing drugs with tenants, and extensive reviews about presumed sex workers.

117. As such, Defendant knew and should have known that B.K. was being trafficked at the Star City Inn & Suites.

118.     At all times relevant, during May 2016 through April 2017, Defendant profited and directly benefited from the room rentals and other good and things purchased as a direct result of their participation in the sex trafficking venture B.K.'s trafficker for her sex trafficking.

119.     In June 2017, the Star City Inn & Suites was permanently closed by the city of Grove City, declaring the property a nuisance property. The city deemed this property a "safety issue," describing police responses nearly one or more times per day. Public documents show the property had extensive so-called prostitution issues.[19]

## THE SEX TRAFFICKING OF B.K. AT THE FORTY MOTEL

120.     Plaintiff B.K. was subjected to sex trafficking at the privately owned Forty Motel located at 3705 W. Broad Street, Columbus, OH 43228.

121.     B.K. and her trafficker stayed at the Forty Motel between 2013 through 2018, frequently staying for days at a time, encountering the same staff, within this period.

122.     Hotel staff at Forty Motel always placed . and her trafficker in a room away from other guests. There were only male guests in and out of B.K. and her trafficker's room while multiple girls were kept in a room at once.

123.     On more than one occasion, B.K.'s trafficker physically abused her at the Defendant's property.

124.     B.K.'s pain and suffering at the Forty Motel was ongoing, as loud sounds of abuse and B.K.'s screams for help could often be heard from the room.

125.     Further, B.K.'s stays at the Forty Motel resulted in several consistent red flags, including, but not limited to: paying for stays in cash; obvious signs of illegal drug use; frequent requests for linen changes; unusually large number of used condoms in the trash; physical abuse

---

[19] https://myfox28columbus.com/news/local/grove-city-shuts-down-motel-declared-a-public-nuisance

in public spaces; visible signs of prior and private physical abuse; unusually large number of male visitors coming in and out of the room; asking the front desk not to be disturbed; women wearing clothing inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms; and loitering or soliciting on hotel grounds.

126. B.K. was repeatedly raped and otherwise sexually abused many times at the Forty Motel.

127. Based on information and belief, before and at the time B.K. was trafficked at the Forty Motel, staff saw B.K. being held captive, controlled, drugged, abused, hit, and trafficked for sex there. Defendant and their employees directly witnessed all signs of sex trafficking, including the trafficking of B.K., described above.

128. Defendant knew or should have known staff at its property was participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their property, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; allowing daily payments of cash for prolonged stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms; allowing many "johns" to come in and out of the rooms where victims were trafficked in; allowing guests to use illicit drugs on property; allowing guests to carry weapons on the property; ignoring large amounts of sex paraphernalia; not addressing trafficking signs and reports of drugs, abuse, and prostitution; forming relationships with traffickers and treating traffickers with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking to authorities or taking any steps to prevent it at their properties.

129. Defendant has direct access to reviews left by guests on websites wherein guests

frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and other signs of trafficking.

130.     Based upon information and belief, Defendant read all online reviews about their property. Numerous reviews were left online about Forty Motel that directly put Defendant on notice of red flags of sex trafficking, including between 2013 through 2018. Reviews specifically mention condoms being found in rooms, drug paraphernalia, presumed sex workers around the property, and an attempted rape on the property.

131.     As such, Defendant knew and should have known that B.K. was being trafficked at the Forty Motel.

132.     At all times relevant, between 2013 through 2018, Defendant, Forty Motel, profited and directly benefited from the room rentals and other good and things purchased as a direct result of their participation in the sex trafficking venture with B.K.'s trafficker for her sex trafficking.

**THE SEX TRAFFICKING OF B.K. AT THE SHADY LANE ADULT MOTEL**

133.     Plaintiff B.K. was subjected to sex trafficking at the independently owned Shady Lane Adult Motel located at 3963 Westerville Road, Columbus, OH 43224.

134.     B.K. and her traffickers stayed at the Shady Lane Adult Motel from 2012 to August 2013, frequently staying for hours or days at a time, encountering the same staff, within this period.

135.     In 2013, the property was sold to P & S and became the Budget Inn.

136.     Hotel staff at Shady Lane always placed B.K. and her trafficker in a room away from other guests. There were only male guests in and out of B.K. and her trafficker's room while multiple girls were kept in a room at once.

137.     On more than one occasion, B.K.'s trafficker physically abused her at the Shady Lane.

138. B.K.'s pain and suffering at the Shady Lane was ongoing, as loud sounds of abuse and B.K.'s screams for help could often be heard from the room.

139. Further, B.K.'s stays at the Shady Lane resulted in several consistent red flags, including, but not limited to: paying for stays in cash; requesting a room away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large number of used condoms in the trash; physical abuse in public spaces; visible signs of prior and private physical abuse; unusually large number of male visitors coming in and out of the room; women wearing clothing inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms; and loitering or soliciting on hotel grounds.

140. These red flags were open and obvious to anyone working at the Shady Lane.

141. B.K. was repeatedly raped and otherwise sexually abused many times at the Shady Lane.

142. Based on information and belief, before and at the time B.K. was trafficked at the Shady Lane Adult Motel, Shady Lane staff saw B.K. being held captive, controlled, drugged, abused, hit, and trafficked for sex there. Shady Lane and their employees directly witnessed all signs of sex trafficking, including the trafficking of B.K., described above.

143. Shady Lane knew or should have known staff at its property was participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their property, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; allowing daily payments of cash for extended stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms; allowing many "johns" to come in and out of the rooms where victims were trafficked in; allowing guests to use illicit drugs

on property; allowing guests to carry weapons on the property; ignoring large amounts of sex paraphernalia; not addressing trafficking signs and reports of drugs, abuse, and prostitution; forming relationships with traffickers and treating traffickers with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking to authorities or taking any steps to prevent it at their properties.

144. As such, Shady Lane knew and should have known that B.K. was being trafficked at the Shady Lane Adult Motel.

145. At all times relevant, from 2012 through August 2013, Shady Lane profited and directly benefited from the room rentals and other good and things purchased as a direct result of their participation in the sex trafficking venture with B.K.'s trafficker for her sex trafficking.

## THE SEX TRAFFICKING OF B.K. AT THE BUDGET INN

146. Plaintiff B.K. was subjected to sex trafficking at the independently owned Budget Inn located at 3963 Westerville Road, Columbus, OH 43224.

147. B.K. and her trafficker stayed at the Budget Inn from about August 2013 through 2018, frequently staying for hours or days at a time, encountering the same staff, within this period.

148. Hotel staff at Budget Inn always placed B.K. and her trafficker in a room away from other guests. There were only male guests in and out of B.K. and her trafficker's room while multiple girls were kept in a room at once.

149. On more than one occasion, B.K.'s trafficker physically abused her at the Budget Inn.

150. B.K.'s pain and suffering at the Budget Inn was ongoing, as loud sounds of abuse and B.K.'s screams for help could often be heard from the room.

151. Further, B.K.'s stays at the Budget Inn resulted in several consistent red flags,

including, but not limited to: paying for stays in cash; requesting a room away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large number of used condoms in the trash; physical abuse in public spaces; visible signs of prior and private physical abuse; unusually large number of male visitors coming in and out of the room; women wearing clothing inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms; and loitering or soliciting on hotel grounds.

152.     Based on information and belief, before and at the time B.K. was trafficked at the Budget Inn, Defendant's staff saw B.K. being held captive, controlled, drugged, abused, hit, and trafficked for sex there. Defendant and their employees directly witnessed all signs of sex trafficking, including the trafficking of B.K. described above.

153.     Defendant knew or should have known staff at its property was participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their property, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; allowing daily payments of cash for extended stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms; allowing many "johns" to come in and out of the rooms where victims were trafficked in; allowing guests to use illicit drugs on property; allowing guests to carry weapons on the property; ignoring large amounts of sex paraphernalia; not addressing trafficking signs and reports of drugs, abuse, and prostitution; forming relationships with traffickers and treating traffickers with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking to authorities or taking any steps to prevent it at their properties.

154.     B.K. was repeatedly raped and otherwise sexually abused many times at the Budget

Inn.

155. These red flags were open and obvious to anyone working at the Budget Inn.

156. Defendant has direct access to reviews left by guests on websites wherein guests frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and other signs of trafficking.

157. Based upon information and belief, Defendant read all online reviews about their property. Numerous reviews were left online about Budget Inn that directly put Defendant on notice of red flags of sex trafficking, including from August 2013 through 2018. Reviews specifically mention no acceptance of credit or debit payments, availability of hourly rates, labeling Budget Inn as a "hookup motel," owner living on the property, and other indicators of illicit activity. Defendant read and responded to online reviews, and one can see their response and acknowledgements online.

158. As such, Defendant knew and should have known that B.K. was being trafficked at the Budget Inn.

159. At all times relevant, from August 2013 through 2018, Defendant profited and directly benefited from the room rentals and other good and things purchased as a direct result of their participation in the sex trafficking venture with B.K.'s trafficker for her sex trafficking.

**THE SEX TRAFFICKING OF B.K. AT THE RED CARPET INN**

160. Plaintiff B.K. was subjected to sex trafficking at the independently owned Red Carpet Inn located at 1289 E. Dublin Granville Road, Columbus, OH 43229.

161. B.K. and her trafficker stayed at the Red Carpet Inn during Fall 2014, frequently staying for days at a time, encountering the same staff, within this period.

162. Hotel staff at Red Carpet Inn always placed B.K. and her trafficker in a room away

from other guests. There were only male guests in and out of B.K. and her trafficker's room while multiple girls were kept in a room at once.

163. On more than one occasion, B.K.'s trafficker physically abused her at the Red Carpet Inn.

164. B.K.'s pain and suffering at the Red Carpet Inn was ongoing, as loud sounds of abuse and B.K.'s screams for help could often be heard from the room.

165. Further, B.K.'s stays at the Red Carpet Inn resulted in several consistent red flags, including, but not limited to: paying for stays in cash; requesting a room away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large number of used condoms in the trash; physical abuse in public spaces; visible signs of prior and private physical abuse; unusually large number of male visitors coming in and out of the room; women wearing clothing inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms;  and loitering or soliciting on hotel property.

166. Based on information and belief, before and at the time B.K. was trafficked at the Red Carpet Inn, staff saw B.K. being held captive, controlled, drugged, abused, hit, and trafficked for sex there. Defendant and their employees directly witnessed all signs of sex trafficking, including the trafficking of B.K., described above.

167. Defendant knew or should have known staff at its property was participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their property, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; allowing daily payments of cash for extended stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms; allowing many "johns" to come in and

out of the rooms where victims were trafficked in; allowing guests to use illicit drugs on property; allowing guests to carry weapons on the property; ignoring large amounts of sex paraphernalia; not addressing trafficking signs and reports of drugs, abuse, and prostitution; forming relationships with traffickers and treating traffickers with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking to authorities or taking any steps to prevent it at their properties.

168.    B.K. was repeatedly raped and otherwise sexually abused many times at the Red Carpet Inn.

169.    Defendant has direct access to reviews left by guests on websites wherein guests frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and other signs of trafficking.

170.    As such, Defendant knew and should have known that B.K. was being trafficked at the Red Carpet Inn.

171.    At all times relevant, during Fall 2014, Defendant, Sunstar Columbus Inc., profited and directly benefited from the room rentals and other good and things purchased as a direct result of their participation in the sex trafficking venture with B.K.'s trafficker for her sex trafficking.

## THE SEX TRAFFICKING OF B.K. AT THE CAPITAL MOTEL

172.    Plaintiff B.K. was subjected to sex trafficking at the independently owned Capital Motel located at 3045 E. Main Street, Columbus, OH 43209.

173.    B.K. and her trafficker stayed at the Capital Motel from during or about 2016 through 2017, frequently staying for days at a time, encountering the same staff, within this period.

174.    Hotel staff at Capital Motel always placed B.K. and her trafficker in a room away from other guests. There were only male guests in and out of B.K. and her trafficker's room while

multiple girls were kept in a room at once.

175. On more than one occasion, B.K.'s trafficker physically abused her at the Defendant's property.

176. B.K.'s pain and suffering at the Capital Motel was ongoing, as loud sounds of abuse and B.K.'s screams for help could often be heard from the room.

177. Further, B.K.'s stays at the Capital Motel resulted in several consistent red flags, including, but not limited to: paying for stays in cash; requesting a room away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large number of used condoms in the trash; physical abuse in public spaces; visible signs of prior and private physical abuse; unusually large number of male visitors coming in and out of the room; women wearing clothing inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms; and loitering or soliciting on hotel property.

178. Based on information and belief, before and at the time B.K. was trafficked at the Capital Motel, staff saw B.K. being held captive, controlled, drugged, abused, hit, and trafficked for sex there. Defendant and their employees directly witnessed all signs of sex trafficking, including the trafficking of B.K., described above.

179. Defendant knew or should have known staff at its property was participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their property, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; allowing daily payments of cash for extended stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms; allowing many "johns" to come in and out of the rooms where victims were trafficked in; allowing guests to use illicit drugs on property;

allowing guests to carry weapons on the property; ignoring large amounts of sex paraphernalia; not addressing trafficking signs and reports of drugs, abuse, and prostitution; forming relationships with traffickers and treating traffickers with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking to authorities or taking any steps to prevent it at their properties.

180.     B.K. was repeatedly raped and otherwise sexually abused many times at the Capital Motel.

181.     Defendant has direct access to reviews left by guests on websites wherein guests frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and other signs of trafficking.

182.     Based upon information and belief, Defendant read all online reviews about their property. Numerous reviews were left online about Capital Motel that directly put Defendant on notice of red flags of sex trafficking, including from 2016 through 2017. Reviews specifically mention presumed sex workers on the property, drug use and drug sales, and used condoms being found in rooms.

183.     As such, Defendant knew and should have known that B.K. was being trafficked at the Capital Motel.

184.     At all times relevant, between 2016 through 2017, Defendant, Sunstar Columbus Inc., profited and directly benefited from the room rentals and other good and things purchased as a direct result of their participation in the sex trafficking venture with B.K.'s trafficker for her sex trafficking.

**THE SEX TRAFFICKING OF B.K. AT THE BROOKSIDE MOTEL**

185.     Plaintiff B.K. was subjected to sex trafficking at the independently owned

Brookside Motel located at 3020 E. Main Street, Columbus, OH 43209.

186.     B.K. and her trafficker stayed at the Brookside Motel from during or about 2016 through 2017, frequently staying for days at a time, encountering the same staff, within this period.

187.     Hotel staff at Brookside Motel always placed B.K. and her trafficker in a room away from other guests. There were only male guests in and out of B.K. and her trafficker's room while multiple girls were kept in a room at once.

188.     On more than one occasion, B.K.'s trafficker physically abused her at the Defendant's property.

189.     B.K.'s pain and suffering at the Brookside Motel was ongoing, as loud sounds of abuse and B.K.'s screams for help could often be heard from the room.

190.     Further, B.K.'s stays at the Brookside Motel resulted in several consistent red flags, including, but not limited to: paying for stays in cash; requesting a room away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large number of used condoms in the trash; physical abuse in public spaces; visible signs of prior and private physical abuse; unusually large number of male visitors coming in and out of the room; women wearing clothing inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms;  and loitering or soliciting on hotel property.

191.     Based on information and belief, before and at the time B.K. was trafficked at the Brookside Motel, staff saw B.K. being held captive, controlled, drugged, abused, hit, and trafficked for sex there. Defendant and their employees directly witnessed all signs of sex trafficking, including the trafficking of B.K., described above.

192.     Defendant knew or should have known staff at its property was participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex

traffickers to operate at their property, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; allowing daily payments of cash for extended stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms; allowing many "johns" to come in and out of the rooms where victims were trafficked in; allowing guests to use illicit drugs on property; allowing guests to carry weapons on the property; ignoring large amounts of sex paraphernalia; not addressing trafficking signs and reports of drugs, abuse, and prostitution; forming relationships with traffickers and treating traffickers with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking to authorities or taking any steps to prevent it at their properties.

193.     B.K. was repeatedly raped and otherwise sexually abused many times at the Brookside Motel.

194.     Defendant has direct access to reviews left by guests on websites wherein guests frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and other signs of trafficking.

195.     Based upon information and belief, Defendant read all online reviews about their property. Numerous reviews were left online about Brookside Motel that directly put Defendant on notice of red flags of sex trafficking, including from 2016 through 2017. Reviews specifically mention extensive illicit activity occurring on the property.

196.     As such, Defendant knew and should have known that B.K. was being trafficked at the Brookside Motel.

197.     At all times relevant, between 2016 through 2017, Defendant, Nandni Corp., profited and directly benefited from the room rentals and other good and things purchased as a

direct result of their participation in the sex trafficking venture with B.K.'s trafficker for her sex trafficking.

### THE SEX TRAFFICKING OF B.K. AT THE HOMETOWN MOTEL

198.    Plaintiff B.K. was subjected to sex trafficking at the independently owned Hometown Motel located at 1300 Harrisburg Pike, Columbus, OH 43223.

199.    B.K. and her trafficker stayed at the Hometown Motel from during or about 2014 through 2017, frequently staying for days at a time, encountering the same staff, within this period.

200.    Hotel staff at Hometown Motel always placed B.K. and her trafficker in a room away from other guests. There were only male guests in and out of B.K. and her trafficker's room while multiple girls were kept in a room at once.

201.    On more than one occasion, B.K.'s trafficker physically abused her at the Defendant's property.

202.    B.K.'s pain and suffering at the Hometown Motel was ongoing, as loud sounds of abuse and B.K.'s screams for help could often be heard from the room.

203.    Further, B.K.'s stays at the Hometown Motel resulted in several consistent red flags, including, but not limited to: paying for stays in cash; requesting a room away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large number of used condoms in the trash; physical abuse in public spaces; visible signs of prior and private physical abuse; unusually large number of male visitors coming in and out of the room; women wearing clothing inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms;  and loitering or soliciting on hotel property.

204.    Based on information and belief, before and at the time B.K. was trafficked at the Hometown Motel, staff saw B.K. being held captive, controlled, drugged, abused, hit, and

trafficked for sex there. Defendant and their employees directly witnessed all signs of sex trafficking, including the trafficking of B.K., described above.

205.     Defendant knew or should have known staff at its property was participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their property, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; allowing daily payments of cash for extended stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms; allowing many "johns" to come in and out of the rooms where victims were trafficked in; allowing guests to use illicit drugs on property; allowing guests to carry weapons on the property; ignoring large amounts of sex paraphernalia; not addressing trafficking signs and reports of drugs, abuse, and prostitution; forming relationships with traffickers and treating traffickers with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking to authorities or taking any steps to prevent it at their properties.

206.     B.K. was repeatedly raped and otherwise sexually abused many times at the Hometown Motel.

207.     Defendant has direct access to reviews left by guests on websites wherein guests frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and other signs of trafficking.

208.     Based upon information and belief, Defendant read all online reviews about their property. Numerous reviews were left online about Hometown Motel that directly put Defendant on notice of red flags of sex trafficking, including from 2014 through 2017. Reviews specifically mention extensive illicit activity occurring on the property.

209. As such, Defendant knew and should have known that B.K. was being trafficked at the Hometown Motel.

210. At all times relevant, between 2014 through 2017, Defendant, OMK, profited and directly benefited from the room rentals and other good and things purchased as a direct result of their participation in the sex trafficking venture with B.K.'s trafficker for her sex trafficking.

## DEFENDANTS ARE JOINTLY AND SEVERALLY LIABLE FOR B.K.'Sknight DAMAGES

211. The venture or ventures in which each Defendant participated were direct, producing and proximate causes of the injuries and damages to B.K.

212. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to B.K. for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSES OF ACTION

## COUNT 1: 18 U.S.C. § 1595 ("TVPRA") (AGAINST ALL DEFENDANTS)

213. Plaintiff incorporates each foregoing allegation in paragraphs 1 through 210.

214. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

215. Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty by facilitating violations of the TVPRA through their participation in the harboring, maintaining, soliciting, and advertising of B.K. and her trafficker for the purposes of commercial

sex induced by force, fraud, or coercion.

216.     Defendants have continued to benefit as a result of these acts, omissions, and/or commissions by renting rooms and providing Wi-Fi to traffickers and customers, keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion, they received payment for rooms or kickbacks from internet usage, contributing to their direct financial benefit from the sex trafficking of B.K. when they knew or should have known that violations of §1595(a) were occurring.

217.     Despite Defendants' knowledge of B.K.'s sex trafficking, B.K.'s trafficker was able to continue renting rooms for the sexual exploitation of B.K.

218.     Defendants participated in a venture together and with, among others, B.K.'s trafficker. Defendants had an ongoing business relationship and association in fact with B.K.'s trafficker. Despite knowing or having reason to know that B.K. was being sex trafficked in violation of the TVPRA, Defendants continued to rent rooms to her trafficker, providing a secure venue for B.K.'s sexual exploitation. B.K.'s sex trafficker used Defendants' Hotels and Motels because they knew that staff members looked the other way despite obvious signs of trafficking. Each of the venturers shared a common purpose – the rental of hotel rooms and the making of profits. Defendants profited while B.K.'s trafficker was able to rent a secure venue to earn profits by trafficking B.K. Defendants participated in the venture by continually renting rooms to B.K.'s trafficker, failing to properly implement anti-trafficking rules and policies, and assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of B.K.'s trafficking.

219.     Defendants' failure to train and supervise their agents and employees, as well as

their disregard for the welfare of their guests, including B.K., enabled and contributed to her sex trafficking.

220.    The facts alleged establish that Defendants knowingly benefited, financially or by receiving anything of value, from participating in a venture that Defendants knew or should have known has engaged in an act in violation of the TVPRA.

221.    Plaintiff B.K. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' hotels and motels. The actions, omissions, and/or commissions alleged in this pleading were the "but for'" and proximate cause of Plaintiff's injuries and damages, therefore Defendants are jointly and severally liable.

## TOLLING OF LIMITATIONS

222.    To the extent that Defendants assert an affirmative defense of limitations, Plaintiff invokes the discovery rule. At the time she was harmed and through the end of her trafficking, she was under the coercion and control of her traffickers who drugged her, threatened her, psychologically abused her, exercised coercive control over her, and severely restricted her freedom. As a result, Plaintiff lacked the information and capacity to understand her injuries and their legal causes.

223.    At the time Plaintiff was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being "trafficked" at Defendants' hotels or that she was a person "trafficked," much less that she was the "victim" of a legal venture involving defendants, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed.

224.    To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking,

Plaintiff faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Plaintiff filed this lawsuit.

225.    While under the control of her traffickers through at least 2018, B.K. did not have the freedom to investigate her claims, to identify those responsible, or to seek legal representation necessary to pursue her legal rights. Plaintiff could not have pursued her claims while under the active control of her traffickers despite the exercise of ordinary diligence.

226.    To the extent Defendants assert an affirmative defense of limitations, Plaintiff also invokes the continuing violation doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants, individually and in concert, across the subject locations.

227.    This continuous trafficking resulted from Defendants' facilitation of trafficking at the subject properties and Defendants' ongoing ventures with one another and with criminal traffickers at those hotel/motel properties.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.    Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b.    Disgorgement of profits obtained through unjust enrichment;

c.    Restitution;

d.    Statutory and/or treble damages, where available;

e.      Punitive damages;

f.      Attorneys' fees and expenses;

g.      The costs of this action;

h.      Pre- and post-judgment interest; and

i.      Any other relief the Court or jury deems appropriate.


## JURY DEMAND

Plaintiff hereby demands a trial by a struck jury.

Dated: June 25, 2025

Respectfully submitted,

*/s/ Jeremy W. Hoshor-Johnson*
Jeremy W. Hoshor-Johnson (0075502)
Penny L. Barrick (0074110)
Steven C. Babin, Jr. (0093584)
Babin Law, LLC
10 West Broad Street, Suite 900
Columbus, Ohio 43215
T: 614-761-8800
E: Steven.babin@babinlaws.com /
Jeremy.hoshorjohnson@babinlaws.com /
Penny.barrick@babinlaws.com